## Case No. 15,376.

UNITED STATES v. HODSON et al.

[14 Int. Rev. Rec. 100.]

Circuit Court, W. D. Wisconsin. Sept., 1871.

INTERNAL REVENUE—SUPERVISORY POWER OF ASSESSOR—NATURE OF AUTHORITY.

Sections 14, 20, Act June 30, 1864 [13 Stat. 226, 229], as amended by the act of July 13, 1866 [14 Stat. 98], clothe assessors of internal revenue with supervisory power over, and authorize them to investigate all accounts, lists, or returns made or required to be made to him by any and all classes of persons liable to pay taxes upon any property, trade, or business; they authorize him to increase the amount of the assessment in all cases of fraud or omission, and to assess upon every party the amount of tax for which he is liable. This authority is in its nature judicial instead of ministerial.

[Cited in U. S. v. Black, Case No. 14,600; U. S. v. Millinger, 7 Fed. 189.]

In equity.

H. L. Palmer, for plaintiff.

A. Hyatt Smith, John Winans, and George B. Smith, for defendants.

Before DAVIS, Circuit Justice, and HOPKINS, District Judge.

HOPKINS, District Judge. This is a suit in equity brought under the authority of the 106th section of the act of July 20, 1868 (15 Stat. 167), to subject the real estate of the principal defendant, William Hodson, to the payment of a tax assessed upon him as a distiller by the assessor of the Second district of this state to the amount of $98,407.50. This assessment was made under the authority conferred upon the assessor by sections 14 and 20 of the act of June 30, 1864, as amended by the act of July 14, 1866 (14 Stat. 101, 103). It was made on the 10th day of October, 1867, and on the 14th of October Hodson appealed from it to the commissioner of internal revenue, and on the 19th of January, 1868, the commissioner affirmed it. It was made because of fraudulent and false returns of Hodson as distiller for spirits manufactured and not reported to the assessor, and for spirits sold by him upon which the tax to that amount had not been paid, in fraud of the provisions of the law. The defendant was duly notified and summoned before the assessor, and appeared and was examined on oath, and testimony was taken before the assessor and a full examination had of the case as provided by law, and after such hearing said assessment was made, and was afterwards affirmed on appeal as before stated. The assessor on the 11th day of October, 1867,

delivered the assessment to the collector of the district to collect. The collector on the same day notified the defendant thereof, and on the 30th of November his deputy, under proper warrant, levied upon certain real estate of the defendant and advertised it for sale. On the 19th of December, 1867, the defendant commenced suit in equity in the United States circuit court for the district of Wisconsin against the collector and his deputy, to set aside the assessment, and obtained injunction restraining the sale. Suit was dismissed in November, 1868. This suit was commenced in February, 1869. The proceedings of the assessor in making the assessment conformed substantially with the requirements of the act. But the defendants claim that the sections above mentioned, under which the assessor acted, are not applicable to distillers, and that he had no jurisdiction in the premises, and that the assessment is therefore absolutely void. If that is so, the bill must be dismissed, for it is only in cases "where it is lawful and has become necessary to seize and sell real estate to satisfy the tax" that a suit of this character can be sustained. We cannot yield our assent to the defendants' view of the act. Upon a careful examination of the provisions of those sections, we think they confer jurisdiction upon assessors in such cases. The claim of defendants' counsel that section 14 relates to "annual lists" only, cannot be sustained. The section, after providing fully for "annual lists," further states, "or if any person without notice shall not deliver a monthly or other list or return at the time required by law, or if any person shall deliver or disclose to any assessor or assistant assessor any list, statement, or return which in the opinion of the assessor is false or fraudulent, or contains any understatement or undervaluation," etc., the assessor may proceed to hear and decide the case in the manner provided therein, "and from the best information which he can obtain, including that derived from the evidence," make "such list or return of the property, and all articles or objects liable to tax, owned or possessed or under the care or management of such person, and assess the tax thereon." The section further provides that the tax thus assessed "shall be collected by the assessor the same as other taxes," and the "list or return so made and subscribed by such assessor or assistant assessor shall be taken and reputed as good and sufficient for all legal purposes." Section 20 rather extends the power of assessors in case of omission in making any list, and authorizes them to assess in case of "omission, understatement or undervaluation, or false or fraudulent statement contained in any return or returns made by any person or parties liable to tax, and to fix the amount the party may be liable for above the amount stated in any return, and certify it to the collector." It also makes applicable all provisions of law for the ascertainment

thereof. The authority of the assessor to make assessment in such cases has been sustained in U. S. v. Six Fermenting Tubs [Case No. 16,296]; In re Lippman [Id. 8,382]. These provisions, in our opinion, confer upon the assessor authority to investigate all accounts, lists, or returns made or required to be made to him by any and all classes of persons liable to pay taxes upon any property, trade, or business. They clothe him with supervisory power over such accounts or returns, and authorize him to increase the amount of the assessment in all cases of fraud or omission, and to assess upon every party the amount of tax for which he is liable under the law. The law fixes the tax, and the revenue officer is simply the instrument or machinery provided for carrying it into effect. The authority confided to him by the sections above named is in its nature judicial instead of ministerial. This law should receive a liberal construction. Revenue laws are not penal or to be considered as penal, but rather as remedial laws. Taylor v. U. S., 3 How. [44 U. S.] 210; Cliquot's Champagne, 3 Wall. [70 U. S.] 145.

Distillers by section 57 of the act of June 30, 1864 (13 Stat. 243), are required tri-monthly to render to the assessor of the district sworn accounts of the "number of gallons of spirits distilled, and also the number of gallons sold or removed for sale or consumption," and we cannot see any reason for exempting those returns or accounts from the operation of the provisions of sections 14 and 20 before mentioned. The reasons, on the contrary, for allowing assessors to exercise such authority over distillers' accounts, we deem far more cogent than for allowing such authority over many other cases; for either the amount of the tax imposed or the nature of the business has shown that fraudulent accounts in that business have been far more frequent and of much greater magnitude than in any other. Hence the importance of authorizing assessors to revise those accounts and assess the proper tax thereon. Again, section 14 of the act of March 2, 1867, confers upon the assessor the right (14 Stat. 480) to assess upon a distiller the tax upon spirits removed other than to a bonded warehouse, and to certify it to the collector for collection. It declares that "that provision shall not exclude any other remedy or proceedings provided by law." An examination of the acts satisfies us that it was the intention of congress to make very stringent the remedy for enforcing the law applicable especially to distillers, and that by the terms used they have undoubtedly done so.

Having come to the conclusion that the assessor had jurisdiction to make the assessment, and that he proceeded therein according to law, the question arises as to what effect is to be given to his decision by the courts. Section 19 of the act of July 13, 1866, as amended by the act of March 2, 1867 (14 Stat. 457), provides that "no suit for the pur-

pose of restraining the assessment or collection of any tax shall be maintained in any court," which in effect makes the assessment conclusive for the purpose of collecting the tax. If no court is authorized to interfere to prevent its collection, it must as a legal sequence be final for that purpose. But the section impliedly provides that a suit may be brought to recover a tax wrongfully collected or illegally assessed after an appeal to the commissioner of internal revenue from the decision of the assessor imposing the tax, provided the suit shall be commenced within six months from the decision or the passage of the act; or if the decision be delayed more than six months from the date of the appeal, then within twelve months from the appeal. That is the only mode provided by law for correcting or testing the legality of the assessment, and the decision of the assessor fixing the amount of the tax, when brought under consideration in any other way, is conclusive. This we think is settled by the adjudicated cases (Nichols v. U. S., 7 Wall. [74 U. S.] 122, 129; Baltimore v. Baltimore R. R., 10 Wall. [77 U. S.] 552), in the last of which the court uses the following language: "These laws not only provide for the manner of collecting the revenue, but also furnish a mode of redress to the party who has suffered injury by their administration." And in the case of Nichols v. U. S., supra, which arose under the general revenue laws, but involving a like question, the court says "that the allowing a suit at all was an act of beneficence on the part of the government. It had confided to the secretary of the treasury the power of deciding in the first instance upon the amount of duties demandable, so it could have made him the final arbiter in all disputes concerning the same." In the case of U. S. v. Wright, 11 Wall. [78 U. S.] 648, the supreme court, speaking of a decision of the postmaster-general upon the question of an allowance refused by him, state the rule as follows: "Congress constituted him the sole judge, and it is not competent for a court or jury to revise his decision, nor is it re-examinable anywhere else, as there is no provision in the law for it." "It may be safely laid down as a general rule," says Judge Story, "that when a particular authority is confided to a public officer, to be exercised by him in his discretion upon an examination of facts of which he is made the judge, his decision upon the facts is, in the absence of any controlling provision of law, absolutely conclusive as to the existence of those facts." Allen v. Blunt [Case No. 217]. This case falls clearly within the principle and doctrine of those cases. The internal revenue act, however, provides a remedy as before stated, but it prescribes the conditions precedent in order to obtain it, and the party wishing to avail himself of that remedy must comply with those terms. It is well settled that an action of assumpsit for money had and received against the col-

lector to recover back the money illegally assessed and paid under protest, is the appropriate and proper remedy under that section. Assessor v. Osborne, 9 Wall. [76 U. S.] 567. And we think it equally clear, upon principle and authority, that, before a party can question the validity of an assessment (the assessor having jurisdiction), he must first pay the tax, and then bring his suit within a year against the collector to recover it back. Insurance Co. v. Ritchie, 5 Wall. [72 U. S.] 541; Philadelphia v. Collector, Id. 731; Nichols v. U. S., 7 Wall. [74 U. S.] 129; Assessor v. Osborne, 9 Wall. [76 U. S.] 567; [Baltimore v. Baltimore R. R.] 10 Wall. [77 U. S.] 552. The defendant Hodson did not pay the tax nor commence a suit within a year, as we have held was necessary; so we hold for the purpose of this suit that this assessment is conclusive, and that the court in this action is not permitted to look into the facts for the purpose of determining whether the assessor decided properly in making it or not. Hodson has waived the privilege of questioning the assessment by omitting to comply with the conditions upon which such right was granted to him, and he must now pay it, or his property must be applied to the payment thereof in the manner provided by law.

Before proceeding with the main branch of the case, we will notice a point of practice raised by defendants' counsel upon the effect of the answers. The complainant in his bill waived an answer under oath, but the defendants notwithstanding put in sworn answers, and insist that they are to have the same benefit therefor as if the oath was not waived. We concur with them in that view. There is no rule of this court allowing a complainant to waive an answer under oath, and without a rule conferring that authority, the complainant cannot do it. It is a long established right and advantage secured to defendants in chancery proceedings. "The rule of courts of equity being that when a defendant in express terms negatives the allegation in the bill, and the evidence of one person only affirms what has been so negatived, then the court will neither make a decree nor send it to a trial at law." 2 Daniell, Ch. Prac. p. 983; Story, Eq. Jur. § 1528. Under that rule the answer must be overcome by more than one witness, but one witness and corroborating circumstances are sufficient. Clark v. Riemsdyck, 9 Cranch [13 U. S.] 160; Hart v. Ten Eyck, 2 Johns. Ch. 92; 1 Greenl. Ev. § 260. It often gives a defendant a very important and not unfrequently decisive advantage; and the plaintiff, without a standing rule or an order of the court expressly authorizing it, cannot deprive him of it. The only effect of waiving it would be to estop the plaintiff from insisting upon a sworn answer. He can waive his rights, but not the defendant's. Cocks v. Izard, 4 Am. Law T. 72; Story, Eq. Pl. § 875a. But it would seem that since the statute allowing parties

to be witnesses, this rule has lost much of its practical effect. For, as in this case, for instance, we have held that the defendants in their own testimony contradict their sworn answers; and it will not be contended, we think, that they have a right to insist that the plaintiff must contradict their answers by another witness besides themselves. It would be too absurd to entertain for a moment that the rule was so inflexible that defendant's answer must prevail unless contradicted by one witness besides his own testimony given in the case. We think that when a defendant in his testimony contradicts his answer, and shows that it is not true, the plaintiff need not call other witnesses to the same effect. The court could not regard such testimony as having the effect of an admission on the trial of the falsity of the answer, and grant the relief upon the defendant's testimony alone as given upon the trial. The defendant would have no right to insist that his own testimony alone should not be taken as true unless sustained by another witness or corroborating circumstances. So that according to the view we have taken of the party's testimony in the case, this question is not of much moment to either side; but if the old rule is to apply to the testimony of the party the same as to any other witness, we think the answers in this case are contradicted and disproved by more than one witness in every instance where we have found against defendants. The assessor had placed this assessment in the hands of the collector, and he was proceeding to collect it, and was authorized "to seize and sell real estate," so that the state of things existed which authorized this suit to ascertain whether the delinquent had any real estate properly subject to the payment of this tax.

Having disposed of these preliminary questions, we will now proceed to examine the evidence and dispose of the case upon its merits. The section of the act under which the bill is filed authorizes the enforcement of "the lien of the tax upon real estate of the delinquent, or to subject any real estate owned by any delinquent, or in which he has any title or interest, to the payment of the tax," and provides that "all persons having liens upon the real estate sought to be subjected to the payment of any tax or claiming any ownership or interest therein shall be made parties to such proceeding." It then authorizes the court "to adjudicate all questions involved therein, and to pass upon and finally determine the merits of claims to and liens upon the real estate in question." So that it becomes the duty of the court to ascertain from the evidence the title and ownership of the real estate described in the bill, and to determine what, if any, interest the principal defendant Hodson had therein, and to decree the sale of such portions as we may find belonged to him and apply the proceeds to the payment of this tax. The first piece

of real estate described in the bill is that which stands in the name of Sarah Ann Ferguson, a daughter of Wm. Hodson, and which we will designate here for convenience as the property on Milwaukee street. This property was bought and paid for by William Hodson, and the title taken in the name of Sarah Ferguson, his daughter, without her knowledge, after he had incurred the liability for this tax. She had no means with which to pay for the same. The allegation in the answer that it was paid for by her money is wholly unsupported by her evidence or the evidence of her father. The agreement which they attempted to establish to show a consideration paid by her is too preposterous to be accredited by any court. He probably intended to give her this property, but he could not do so while owing this tax, or to avoid the payment of it. We therefore hold that this property belongs in equity to the defendant William Hodson, and that Sarah Ann Ferguson holds the same in trust without any interest therein whatever, and that the same is subject to this tax, and should be sold and applied to the payment thereof. The property described in the bill, and which was conveyed to the defendant William Tibbetts by deed of date of May 20, 1867, and which we will designate herein for convenience as the "Turtleville Farm," we think is in equity the property of William Hodson, and that the deed given to William Tibbetts of the date aforesaid by William Hodson was without consideration, and was given to and received by said Tibbetts in order to defraud the government out of this tax and prevent its being reached or applied to the payment thereof; that the same is subject to the payment of said tax, and that the said Tibbetts has no beneficial interest therein as against the plaintiff in this suit. The answers of Hodson and Tibbetts allege that the farm was sold to Tibbetts in September, 1866, by contract, he agreeing to pay for it $4,500 in money, pay a dower interest of Mrs. Lewis, and to give Hodson the use of the farm for the three ensuing years. Hodson paying taxes; that he paid down on execution of contract $2,500, and agreed to pay $1,000 in one month and the balance in May, 1867, when deed was to be executed to him, all of which it is stated he paid. Tibbetts was a workman for Hodson in his distillery at Shopiere from September, 1864, to May, 1865, at the very time these frauds were perpetrated by Hodson upon the law, and which he must have known. Hodson and Tibbetts were both sworn on behalf of complainant. Their story is so extravagant and unnatural as to evidence its own falsity. Tibbetts says he had been engaged for several years before going to work for Hodson in the produce business at Fond du Lac, doing $200,000 annually; that his warehouse was burnt in the summer of 1864, which was of but small value, being insured for only $150. He says he was thrown out of business by that circumstance, and then went to work for Hodson in his distillery for $50 per month. He swears that when he was burnt out he had in his safe at his house at Fond du Lac $15,000 in currency, that he removed the safe with the money in it to Shopiere when he went to work for Hodson, and kept it there in his own house during the time he worked for him. He tells this story to account for his having money to pay for the farm. It is so strange and unusual that we cannot believe it. Its inherent improbabilities are enough to refute it. The idea that a man doing $200,000 worth of business annually should be broken up by the destruction of a warehouse of the value of $200 or $300, when he had $15,000 in cash in his safe that he could employ to go on again, beggars credulity; and that he should on account of being thus broken up go to work at so small a salary and not invest his money, the interest upon which would have been more than twice as much as his salary, is so contrary to the common course of men that we could not without strong corroborating circumstances believe it. And, instead of being supported in his statements, he is contradicted in one very material fact, that is, the fact of his having a safe at all. The preponderance of evidence is that he did not have a safe. The man from whom he swears he bought it swears that he never sold him one, and further that he was familiar with his business and never saw or knew that he had one, and, what is very strange, no one ever saw it at Shopiere. The circumstances all tend to show that this story about his means was a sheer fabrication, and this circumstance that he swore to to render the story probable was as groundless and visionary as the story itself. The bankers of Fond du Lac never understood that he possessed any such means. He had no reputation of possessing it, and his bank account was altogether too insignificant to warrant any one in believing that he was the possessor of any such amount of money. There are other remarkable and unusual features about the transaction, as that the sale was made at Fond du Lac when Hodson and his wife were there on a visit, and although the deed bears date on the 20th of May, 1867, it was not recorded until November 9, 1868, the date and record being the same as some other deeds that we shall have occasion to refer to often; that the price at which Hodson pretended to sell it was far below its real value; that when he went to Fond du Lac he had but very little means, and his income returns given in evidence negative the idea that he had made any such amount as he claimed to have after going there. Again, by the state statute every tax-payer is required to list his personal property for taxation, stating the particular kind, and, if he has money, the amount, to which he is required to make oath. He made such returns annually from 1861 to 1866 inclusive. They were as follows: 1861,

$275; 1862. $130; 1863, $400; 1864, $340; 1865, nothing; and in 1866, $50; which shows that if he had any such amount of money as he now attempts to make out he had, he must have sworn falsely in making such returns. The circumstances attending the transaction, as detailed by both Tibbetts and Hodson, are such as to throw discredit upon the whole matter and force us to believe that the sale was merely colorable, and made out for the purpose of defrauding the government out of the tax. It is not necessary to pursue this transaction further. We entertain no doubt of its mala fides.

Hodson first took the title to a part of the property in the name of his daughter Maria, but she did not pay anything for it; he paid for it with his own money, and she never had any interest in it or means with which to purchase it. And the piece of three and one-half acres that was deeded to her by him, as he swears, in exchange for her deed to him of the farm, was without consideration and was void, and is subject to the payment of the tax above mentioned. One-half of the property described in the complaint, upon which the grist mill, distillery, etc., are situated, consisting of about twenty-three acres, and which we for convenience designate herein as the "Turtleville Mill Property," confessedly belongs to William Hodson, although the deed was not on record when this suit was commenced, but it is admitted that John R. had conveyed an undivided half of what he owned to William, and that he was the owner thereof at the commencement of the suit. That is subject, of course, to the payment of this tax. The other half was conveyed by John to his stepmother, Sarah Hodson. The case shows that John obtained the title to the most of this property as early as 1853, and has continued to hold it in his own name to the time of conveying it to his father and mother, as before stated. Although he says the deed to his mother was in consideration of natural love and affection, still we think it is good. If he owned the property he had a right to give it away. The government had no claim against him, and has not now. This deed conveyed a good title to her as against everybody but his creditors. It is alleged that he held the title in trust for the benefit of his father; that he took the title first in 1853 to defraud his father's creditors: but we do not feel it our duty to go back to 1853 to inquire into the consideration of that transaction in order to defeat the title of Mr. Hodson, but shall regard John as owner up to the time he conveyed to, his father and mother, and that the moiety conveyed to his mother is her individual property, and not subject to the payment of this tax, and that the interest of William Hodson therein be sold under the decree in this case, —whether that is more than an undivided half we are not certain. From the exhibits it would seem that some portions of it were conveyed by other parties to William Hodson, which in preparing the decree must be examined and settled.

We now come to the consideration of the property standing in the name of Charles W. Hodson. The property known as the "Excelsior Mill Property," and 500 inches of water attached, we think is not subject to this tax. That property was bought of other parties by Charles in his own name, in September, 1861, and he became responsible for the payment of the consideration, and, even if he took a part of the funds realized from the sale of the spirits upon which the tax had not been paid, that would not give William Hodson any title or claim to the property. He would have a claim against him for the money thus used, but would not have any lien upon the premises purchased with it. Whether he did use the money of William for that purpose, we express no opinion, as it is immaterial in this case, for if he did the property could not be reached in this suit.

But as to the property deeded William Hodson by Spensely on the 5th day of September, 1866, therein designated as the "Barstow Property," and which was by deed bearing date May 20th, 1867, conveyed by William to him, a different question is presented. If that deed was given without consideration, and to avoid the payment of this tax, it was void; and the title in equity remained in William so far as this plaintiff is concerned, and can be reached in this case. This involves a consideration of the testimony of the transactions between Charles and his father, and a particular examination of Charles's business affairs for some time before and after the transaction. They allege in their answers that Charles loaned to his father when he bought that property $3,000 to pay for it, and that his father in May, 1867, for the purpose of securing the payment of it, deeded the property to Charles.

We must pass upon this case upon the theory that William Hodson during the years 1865, 1866, had received or ought to have received about the amount of this tax from the sale of spirits illegally disposed of; that he was violating the revenue laws during that time, and that his sons John and Charles must have been cognizant of it, and co-operated with him in the matter. This being so, it would seem improbable that he should have wanted to borrow this money of Charles at that time, and the testimony fails to satisfy us that he did borrow it of Charles, or that Charles had it to loan of his own means. The spirits were shipped by Charles, who had a warehouse at Janesville, to John at Chicago, and sold by John and the funds returned to somebody, but the evidence does not disclose expressly to whom, but we think by a fair consideration of the testimony, we are warranted in holding that they came back to Charles. We think the condition of his bank account, unexplained, shows uncontrovertibly that such was the case. Notwithstanding

Charles shipped all of the spirits, he did not keep any account of the shipments or receipts, and although John sold them he did not keep any account of the sales; neither of them kept any account with their father in reference to these matters, and both swear that they are unable to tell the quantity shipped or sold, or the amount received therefor. Such conduct we cannot reconcile with any honest business, or any business honestly conducted. We think this business was purposely transacted in that way by the parties, in order to conceal all evidence of the amount of spirits sold, and that both John and Charles were parties to and aided and assisted their father in violating the revenue law. We are well satisfied that a large amount of the proceeds of that illegal traffic went into the bank account of Charles, and that the money which he used in paying for the "Barstow property," and buying the $5,000 mortgage upon the "Turtleville mill property." was money received by him from the sale of his father's spirits, and that he used his father's money for those purposes and not his own. Therefore we hold that the "Barstow property" belongs to William Hodson and not to Charles, and that the deed to Charles from his father of the date of May 20, 1867, is void as against the complainant in this case, and that the $5,000 mortgage upon the "Turtleville mill property," which was assigned to Charles in January, 1866, was purchased with the means of William Hodson and not of Charles, and that it is paid and should be cancelled, and that Charles must cancel or discharge the same of record.

These conclusions we think are inevitable from Charles's returns of taxable property to the assessor for several years before and after that time, his income returns during the same period, and his bank accounts for the same time. His list of personal property which he returned amounted in 1861 to $620; 1862, $560; 1863, $245; 1864, $200; 1865, $1,-130; 1866, $1,830; 1867, $2,330; in 1869, $2,-400, in none of which does he list any mortgages or credits. We are unwilling to believe that if he had been the owner in fact of that $5,000 mortgage in 1866, 1867, and 1869, that he would not have included it, as he swore that each list contained a true list of all his personal property liable to taxation, which was false for the last three years if he owned that mortgage. His income returns for the same period do not show that he was making money in his business sufficient to have those amounts to loan or invest in that way. He returned an income for the year 1862 of $83; 1865, gross amount, $2,321, net, $86; 1866, gross, $4,000, net, $3,000; 1869, gross, $1,000, net, nothing. These returns neutralize his testimony as to the extent of his means derived from his business, and show that in that respect it is not reliable, and satisfying us that he was not in the receipt of funds from his own business to loan his father therefrom $3,000 in September, 1866, or to buy the $5,000 mortgage in Janu-

ary, 1866, especially as it appears that in the year 1865 he paid balance of purchase on this mill, $5,000, and for the extra water $2,000. His testimony is that he loaned, during the year 1866 in the purchase of the $5,000 mortgage and to his father on the purchase of the "Barstow property" $8,000, and invested permanently in his own business, the year before $7,000, all of which he swears he took from his own business. These sworn returns negative that testimony effectually. An inspection of his bank account during those years furnishes the most convincing evidence to our minds of the correctness of our conclusion as to the source from which he received the money to use for such purposes. It appears from the bank accounts that there was a very extraordinary increase in his deposits during the years 1865 and 1866, and a great decrease in his discounts, and what is very remarkable the increase in his deposit account does not differ much from the amount his father ought to have received from the quantity of spirits which he sold without the payment of the taxes. In 1863 his bank account shows his deposits were $67,821 90, his discounts $40,462 10; 1864, deposits, $67,679 24, discounts $23,500; in 1865, deposits, $107,061 43, discounts $15,576; and in 1866, deposits $158,-384 17, discounts $13,900. From what source did he receive the increased amount of money which he deposited in the years 1865 and 1866? (the two years during which those spirits were sold). If he could why did he not give some reason or explanation for such increase of his deposit account during those years? He did not attempt to explain this matter. We have a right to hold, in the absence of any account or evidence showing to the contrary, or showing what he did with the additional amount of money thus deposited, which he could have shown by the production of his checks, that the additional amount was the proceeds of the illegal sales of spirits belonging to his father. As the testimony now stands, the increase in his deposit account and decrease in his discounts can only be explained or accounted for upon the theory that he kept his father's money received from sales of spirits in his own name in the bank. The deed of the "Barstow property" to Charles, like the deed to Tibbetts, bears date on the 20th of May, 1867, and, like that, was not recorded until the 9th of November, 1868; both were dated on the same day and both were recorded on the same day, and were given, we entertain no doubt, to enable the defendant to defraud the plaintiff out of this tax, and that both Charles and Tibbetts, when they received them, knew the object and intent for which they were given.

This disposes of all the property mentioned in the pleadings. We have not attempted to describe the property; the counsel on drafting the decree will see that the property is properly described in it. The complainant's solicitor will prepare drafts of decree in accordance with this opinion against the defend-

ants William Hodson, Charles W. Hodson, William Tibbetts, Sarah Ann Ferguson, and —— Ferguson, her husband, and Maria Hodson, with costs to complainant to be taxed, and the bill as to John R. Hodson, Sarah Hodson, Bates, and Allen, is dismissed. The counsel will give notice of the settling the terms of the decree before a judge of the court to the defendant's solicitors. The decree will direct that the property be sold by one of the masters of the court at auction to the highest bidder upon notice of six weeks published in the Wisconsin Journal, Janesville Gazette, and Beloit Journal, once in each week, and that on the confirmation of the sale that the master execute deed ordered to the purchaser thereof, and that the defendants and all persons claiming under or any of them surrender the possession to such purchasers.

DAVIS, Circuit Justice. I concur in this opinion and decree to be prepared.